## WEBER v. CITY OF CHEYENNE
(No. 2145; January 9, 1940; 97 Pac. (2d) 667)

For the appellant, there was a brief and oral argument by *Edward T. Lazear* of Cheyenne.

For the respondent, there was a brief and oral argument by *H. B. Henderson, Jr.* of Cheyenne.

RINER, Chief Justice.

Direct appeal proceedings bring this cause here to review a judgment of the district court of Laramie County. The material facts to be considered are in substance these: In February, 1937, the Paul H. Moore Realty Company was the owner of certain real estate adjacent to the then boundaries of the City of Cheyenne, Wyoming, which this Company had arranged in blocks, with subdivisions into lots. On the 6th of that month, said Company entered into a written contract with one Jake Weber, a resident of the city aforesaid, whereby Weber agreed to purchase from that Company "Lots Thirteen (13) and Fourteen (14) in Block Nine (9) of a proposed subdivision to the City of Cheyenne, Wyoming, to be known as Moore Haven Heights Addition, Third Filing," to the said city. This contract, among other provisions, contained the following:

"This land is sold for business purposes only and no more than one building is to be built on each lot. Buildings to be of brick construction and to cost not less than $5000.00 when completed. Front of building erected on above described land to be set back from the

front lot line at least thirty-five (35) feet. No unsightly structures are to be erected on above described land.

"All of the above restrictions are to be included in any deed which the parties hereto, their successors, heirs or assigns shall give to this property."

The purchase price of the two lots was stipulated at $1,250.00, which was to be paid—a certain amount at the execution of the contract and the remainder in stated installments. On March 29, 1939, when the action presently to be mentioned was tried, Weber had paid something over $500.00 on the contract. The instrument itself was not recorded.

Some six weeks before the property embracing these lots was formally annexed to the City of Cheyenne, the President and Secretary of the Realty Company had a conversation with the Mayor of the City of Cheyenne in the latter's office in said City. In that conversation the City official aforesaid was informed, with reference to the restrictions on the lots set forth above, that the Company "had planned to have them into business." The Mayor made no comment in response to this information.

On June 7, 1937, the lots mentioned above, with other land owned by the Realty Company, were annexed to the City of Cheyenne by formal legal proceedings for that purpose. When Weber first learned that the City contemplated zoning this property and before the ordinance for that purpose was passed, he went to the Mayor of the City and notified him of the existence of the contract and that "it called for a business property," to which that official, as Weber testified, responded that "he had no intentions of any more businesses going into that area, and that it was just too bad for me to have had the lots." Thereafter the City zoned these lots 13 and 14 for residential purposes only. August 15, 1938, Weber again applied, with writ-

ten petition, to the City Council of the City of Cheyenne to have the zoning of said lots changed so that they could be used for business purposes, as required by the terms of his contract. He also applied to the City Engineer for a permit to build a gasoline filling station on this property, but the permit was by that official denied. The matter was then referred to the City's Board of Adjustment under the zoning ordinance, and that body also, on the date last above mentioned, turned the application for a permit over to the City Council, stating in its minutes that it (the said Board) had no power to change the zoning, which change was necessary before any such permit could be granted. Thereafter, and on September 12, 1938, subsequent to published notice being given, the City Council of the City of Cheyenne, by formal vote, declined to make any change in the zoning of these lots, as applied for by Weber.

October 25, 1938, Weber, as plaintiff, instituted an action in the district court above named against the City of Cheyenne as defendant, to restrain it from enforcing that part of the zoning ordinance which undertook to classify said lots 13 and 14 as residential property only. After the cause came at issue it was tried to the court without a jury, with the result that after hearing the plaintiff's evidence, on defendant's motion, the district court found generally for the latter, and entered its judgment that the prayer of plaintiff's petition be denied and that the defendant be awarded its costs. The plaintiff has brought the case here claiming error.

At the trial of the action it was proven by plaintiff's undisputed testimony that he had a contract with another party for the sale of the lots aforesaid and the erection of a gasoline filling station upon them; that this contract was oral and the parties thereto were obligated, as plaintiff says, conditional only upon

Weber's obtaining a change in the zoning of the lots aforesaid from residential to business purposes; that Weber has made the building plans and supplied an estimate of the cost of the building, and that these plans and estimate have been accepted by the other person. It does not appear that that party has, or will, pay anything on the purchase price until this litigation shall be concluded, and then only if a permit can be obtained for a filling station on said lots. The record establishes also that Lots 13 and 14 aforesaid were at the time of the trial of the action more valuable for business than for residential purposes; that the contract with the Realty Company was in full force and not in default of any kind; and that Weber still holds said contract as his own.

The plaintiff offered to prove "that the territory and area immediately north of Lots 13 and 14 in Block 9, from the area in the middle of Block 9 north along Central Avenue up to Eighth Avenue, and comprising Lots 1 and 2 in Block 9, Lots 13 and 14, and Lots 1 and 2 in Block 2, are now used for business purposes, and that business structures are immediately adjacent to and north of the plaintiff's property." However, upon objection by defendant being made that the offer was of evidence "incompetent, irrelevant and immaterial," the court ruled adversely to its reception, to which ruling plaintiff excepted, and the ruling is assigned here as error. It is also claimed for appellant that the judgment rendered by the district court is contrary to law.

The City of Cheyenne now contends that Weber could not maintain the action described above because he is not the real party in interest. This is said because he has tentative arrangements with a third party, as above related, regarding the latter's proposed purchase of the lots and the erection by Weber (whose business

is that of a contractor) of a gasoline filling station, as heretofore stated. 47 C. J. 35 says that:

"A 'real party in interest' is one who has an actual and substantial interest in the subject matter, as distinguished from one who has only a nominal interest, having reference not merely to the name in which the action was brought, but to the facts as they appear of record. He must be the present owner of the right sought to be enforced, even though his ownership is of the nature of a special property or equitable interest in the subject matter of the suit."

And 1 Sutherland's Code Pleading, Practice and Forms, Section 12, Page 11, declares:

"Whatever may be the rule under the old system, the 'real party in interest' is the party who would be benefited or injured by the judgment or the 'party entitled to the avails of the suit.' 'Interest,' within the meaning of this rule, means material interest, an interest in issue and to be affected by the decree, as distinguished from mere interest in the question involved, or mere incidental interest."

Tested by these rules it would appear that Weber was "clearly a real party in interest." He had never assigned his contract with the Realty Company to the person with whom he was negotiating concerning the erection of the filling station. At the time suit was brought and during pendency of the action in the district court that party had no interest in the contract for the purchase of the lots 13 and 14, and might never have any. Weber was obviously the one who would be benefited or injured as the result of the litigation at bar. He was undoubtedly the "present owner of the right sought to be enforced." The fact that at the time suit was brought and the trial thereof had, the contract of purchase with the Realty Company had not been altogether fully carried out according to its terms cannot change the situation either. As we have observed, the record establishes that Weber was not in default

as to the payments under it and that he was financially able to meet his obligation thereunder. Accordingly, we think the City's contention on this point devoid of merit.

It is also urged for the City that inasmuch as the Weber contract was not recorded and there was no notation on the plat filed in the course of the proceedings annexing these lots to the municipality which indicated that any restriction existed relative to the lots in question, the City had no notice thereof, and even if it had received notice of such restriction, this fact would not be binding "even prior to dedication" of the property by its annexation to the City. No pertinent authorities are cited in support of this position. It is apparent from what has already been said that the Mayor of the City had received repeated actual notice of the true situation in which this property stood, both through the officers of the Realty Company and through Weber himself. Inasmuch as the Mayor is the chief executive officer of the City and presides at all meetings of the City Council (W. R. S., 1931, Section 22-611), which body controls the matter of zoning (W. R. S., 1931, Section 22-1001), it is our view that the City had abundant actual notice of the restriction embodied in Weber's contract with the Realty Company. The City assuredly had such notice when its council held a formal meeting for the express purpose of acting upon Weber's petition for a change in the zoning of the lots now involved and expressly declined to make any such change.

Additionally, 18 C. J. 70 states that:

"In applying the general rule that the dedicator may impose reasonable conditions and restrictions on making a dedication of his property, it is of course competent for him to limit the use of his property to a specified use or purpose."

See also Gwin et al. v. City of Greenwood, 150 Miss.

656, 115 So. 890, 58 A. L. R. 849. We consider the City to be mistaken in its position on this point.

The further contention is advanced for the municipality that Weber has a right and should be confined to relief from the situation in which he finds himself by invoking proceedings against the Realty Company as contract grantors. We are not inclined to think that this position is sound. The Paul H. Moore Realty Company had no reason to think that the City would disregard a restriction imposed by it upon its property when brought into the City and which it is not contended here it had no right to make prior thereto. Especially is this so when the consequences of the City zoning this property, as was done—as will be presently pointed out—are so serious to the contract holder. When the chief executive officer of the City was advised of the situation in which the lots stood, before they were annexed to the City of Cheyenne, he raised no objection to the property being received subject to such restrictions and apparently acquiesced in such an arrangement. If he had at that time notified the officers of the Realty Company what was intended to be done by the City in the matter of zoning this property for residential purposes, doubtless the situation which has produced this lawsuit would not have arisen.

It appears that the statutory authority given the municipality under the state law permitting zoning in the "incorporated cities, towns and villages of this state" is "for the purpose of promoting health, safety, morals and the general welfare of the community" (W. R. S., 1931, Sec. 22-1001). This authority is, of course, referable to the police power of the state thus delegated to municipalities. However, this power is not an unlimited one, but is subject to review by the courts relative to the manner in which it is exercised, as the following appellate decisions attest:

In Catholic Bishop of Chicago v. Kingery, 371 Ill.

257, 20 N. E. (2d) 583, where village property had been zoned for residential purposes, which included public schools but not private schools, the denial of a permit for a private school was reversed upon appeal to the Illinois courts, and the tribunal of final authority in that state said:

"Under the police power, cities and villages have the right to adopt zoning ordinances which impose a reasonable restraint upon the use of private property. City of Aurora v. Burns, 319 Ill. 84, 149 N. E. 784; Reschke v. Village of Winnetka, 363 Ill. 478, 2 N. E. 2d 718; People v. City of Rockford, 363 Ill. 531, 2 N. E. 2d 842; Johnson v. Village of Villa Park, 370 Ill. 272, 18 N. E. 2d 887. Such exercise of the police power is not unlimited but must bear a substantial relationship to the preservation of the public health, safety, morals or general welfare. Koss v. Saunders, 349 Ill. 442, 182 N. E. 415; Western Theological Seminary v. City of Evanston, 325 Ill. 511, 156 N. E. 778. If it is apparent that an ordinance restricts the property rights of individuals without having any direct substantial relationship to the promotion of the public health, safety, morals or welfare, then such an ordinance is invalid and cannot be sustained. Forbes v. Hubbard, 348 Ill. 166, 180 N. E. 767; State Bank & Trust Co. v. Village of Wilmette, 358 Ill. 311, 193 N. E. 131, 96 A. L. R. 1327; Johnson v. Village of Villa Park, supra."

See also Johnson v. Village of Villa Park, 370 Ill. 272, 18 N. E. (2d) 887.

Where property originally zoned for residential purposes was rezoned for business and a permit for a gasoline filling station given upon the express agreement between the City and the permittee that floodlights would not be used on the premises, in City of Alexandria v. Texas Co., 172 Va. 209, 1 S. E. (2d) 296, after erection of the station the Texas Company sought an injunction to restrain the City from interfering with its installation of floodlights. It appeared that other stations of this character located near by used similar

types of lights. An injunction was granted, and in affirming the decree the court said:

"But under its police power a city may not arbitrariy restrict an owner in the use of his property. A restriction of the character sought to be imposed here must 'bear a substantial relation to the public health, safety, morals, or general welfare.' Nectow v. City of Cambridge, 277 U. S. 183, 188, 48 S. Ct. 447, 72 L. Ed. 842. See, also, West Bros. Brick Co. v. Alexandria, supra, (169 Va. 271, 192 S. E. 881).

"In the instant case there is no evidence whatsoever that the restriction against this property owner's use of the desired type of lighting bears any relation to the public health, safety, morals, or general welfare.

"In the next place, the equal protection clause of the Fourteenth Amendment, Const. U. S. C. A., prohibits the discrimination against an owner in the imposition of restrictions on the use of his property. A city may not deny to one owner the privilege of installing on his property the type of lighting which he desires, and grant such a privilege to another property owner of like qualifications under like circumstances and conditions. Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220; Thompson v. Smith, 155 Va. 367, 377, 154 S. E. 579, 71 A. L. R. 604.

"And yet that is precisely what the city has done in the instant case. While The Texas Company is denied the right to use floodlights on its filling station, the privilege to do so is granted to its competitors in the same neighborhood and even on the same street. The record discloses no reason whatsoever for this discrimination.

"We think, therefore, that the restriction which the city has imposed upon The Texas Company's use of its property, in forbidding it the right to install thereon the desired system of lighting, is arbitrary, discriminatory, and violative of the rights guaranteed to this property owner under the Fourteenth Amendment."

The case of Nectow v. City of Cambridge, 277 U. S. 183, 48 S. Ct. Rep. 447, 42 L. Ed. 842, was one where a mandatory injunction was sought to compel the City and its Building Inspector to pass upon an application

of the plaintiff in error for a permit to erect any lawful buildings upon a tract of land without regard to the provisions of the ordinance of the City including such tract within a residential district. It appeared "that no practical use can be made of the land in question for residential purposes, because among other reasons herein related, there would not be adequate return on the amount of any investment for the development of the property"; and also that it was "pretty clear that because of the industrial and railroad purposes to which the immediately adjoining lands to the south and east have been devoted and for which they are zoned, the locus is of comparatively little value for the limited uses permitted by the ordinance." A judgment of the Supreme Judicial Court of Massachusetts ordering the dismissal of plaintiff in error's suit, was reversed, and in the course of the opinion filed this was said:

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. Euclid v. Ambler Co., supra, p. 395, (47 S. Ct. 114). * * * * * * That the invasion of the property of plaintiff in error was serious and highly injurious is clearly established; and, since a necessary basis for the support of that invasion is wanting, the action of the zoning authorities comes within the ban of the Fourteenth Amendment and cannot be sustained."

See also Dobbins v. City of Los Angeles, 195 U. S. 223, 25 S. Ct. Rep. 18, 49 L. Ed. 169; Tillotson v. City Council of Cranston (R. I.) 200 A. 767; Hedgcock v. People ex rel. Arden Realty & Inv. Co., 98 Colo. 522, 57 P. (2d) 891.

It has been held also by reputable appellate courts that where retroactive zoning ordinances caused sub-

stantial injury and the prohibited business is not a nuisance, the ordinance is to that extent an unreasonable exercise of the police power. See Jones v. City of Los Angeles, 211 Cal. 304, 295 P. 14. And the Supreme Court of Michigan in Adams et al. v. Kalamazoo Ice & Fuel Co., 245 Mich. 261, 222 N. W. 86, remarked:

"The ordinance excepts from its restrictive provisions, existing nonconforming uses, but even if it did not contain such an exception, we cannot hold its restrictions retroactive though defendant, anticipating its enactment, purchased the property and placed its small distributing building thereon. Threatened invasion of a residence district by business may be an impelling reason for affording protection by way of a zoning ordinance, but such an ordinance may not operate to remove business found there. The legitimate purpose of a zoning ordinance, in its restrictive provisions relative to a residence district, is to preserve and not to disrupt existing conditions."

In the ordinance of the City now under review there are found exceptive provisions akin to those referred to in the case just cited.

The appellant has directed our attention to many cases wherein it has been decided that the right of a purchaser of a lot in a residential section to rely upon building restrictions confining the use thereof to residential purposes contained in a covenant in the deed to the property, cannot be interfered with by a zoning ordinance classifying the property for business use. See Burgess v. Magarian, 214 Iowa 694, 243 N. W. 356; Ludgate v. Somerville, 121 Or. 643, 256 P. 1043; Dolan v. Brown, 338 Ill. 412, 170 N. E. 425. Whether the reverse situation, where the building restriction is for business purposes only and the zoning is for residential purposes—the case at bar—should invoke the same ruling, we do not under the present facts find it necessary to decide. General expressions in some of the cases called to our attention, as above stated, would

seem to indicate an affirmative answer to this query. See Dolan v. Brown, supra. There is an additional factor, however, which we deem controlling here in addition to the principles announced in the decisions above reviewed and from which excerpts have been quoted.

It appears from the record, and it is strongly argued for appellant, that the net result of the action of the City in this matter when taken in conjunction with the contract which the appellant holds with the Paul H. Moore Realty Company containing the covenant for the use of Lots 13 and 14 for "business purposes only," is to deprive Weber of the use of the property for any practical purpose. There seems to be no reason or contention advanced here why the Realty Company could not before the lots in question were taken into the City and the restrictive zoning applied, make the restriction it did in its contract with Weber. Indeed, if, as seems to be the fact, it was in accord with the Realty Company's scheme of handling its property for the benefit of near by residence property, there would be much reason for approving such an arrangement. At any rate, since it would seem that Weber will in fact be deprived of any really beneficial use of his property, and that being so, the following cases afford guides in directing as to what disposition shall be made of the cause now before us.

In People ex rel. Deitenbeck v. Village of Oak Park, 331 Ill. 406, 163 N. E. 445, where it was sought to compel a village by mandamus proceedings to issue to appellant a permit for the construction of a gasoline filling station and the trial court denied the writ, the case was sent directly to the State court of last resort. The property having been zoned for residential use, the municipal authorities had accordingly denied the permit, and this action received the approval of the

Circuit Court. Reversing the judgment below, the Supreme Court of Illinois said:

"In the instant case, under the test provided by the village ordinance, appellant's property is declared to be within a residence district, and she is unable, without the written consent of the owners of over 50 per cent. of the property in that district, to construct and operate a filling station upon her vacant corner property, even though the balance of her adjoining property has been used for some years for commercial purposes, and the other properties facing upon both sides of the same street are occupied by various kinds of business. In addition thereto, a gasoline filling station is now operated just across the street from appellant's proposed filling station, and other service stations and garages are in operation in the adjoining block. The facts presented by the record are undisputed, and clearly established that the immediate neighborhood in which appellant's property is located is devoted to commercial pursuits. Even a majority of the property within the 400-foot radius designated by the ordinance was at the time this suit was instituted, or has since been, zoned for business use. The actual circumstances and facts in the case at bar have been of no consequence in determining the nature or character of the district. The ordinance as here applied has produced an arbitrary and oppressive result, and no particular or serious suggestions in defense of its provisions have been presented for our consideration."

Recalling at this point the offer of testimony excluded by the trial court, as related above, and the effort of Weber, disclosed by the record and rendered nugatory upon objection and ruling of the district court, to show that these lots before being taken into the City were designed by the Realty Company as a part of a general scheme of having a "segregated business district in that locality," all of which testimony was in our judgment admissible and should have been received as directly bearing upon the reasonableness of the action taken by the City authorities and whether such action had any substantial relation to the public health, safety,

morals or general welfare of the City of Cheyenne, it would appear that the situation presented by the Deitenbeck case, supra, rather closely resembles that at bar.

In Bull Moose Holding Corporation v. Fergus Realty Corporation, 269 N. Y. S. 285, the court pointed out that:

"The combination of the zoning ordinance effective when plaintiff bought the property, the instrument of restrictions, and the zoning law as amended, precludes the use of a part of the property for any practical purpose, since it appears that the only use to which the property can profitably be put is in connection with automobile service."

A use of the property there involved for ordinary business, including public garages and gasoline filling stations, but not including factories or nuisances, was therefore ordered by the court, though the building restriction applicable to the property was for a use thereof for garden apartments.

In Eaton v. Sweeny, Commissioner of Public Safety, 257 N. Y. 176, 177 N. E. 412, holding that a zoning restriction could not be enforced where the property owner was deprived of all beneficial use of his property, the Court of Appeals of New York said:

"In this case, if the relator has been deprived of all beneficial use of his property, if he cannot use it for business or for dwellings or boarding houses, then the city restriction is unreasonable and arbitrary as to him, and should be modified so as to permit some profitable user in conformity to surrounding conditions. Sundlun v. Zoning Board of Review of City of Pawtucket, 50 R. I. 108, 145 A. 451; Anderson v. Jester, 206 Iowa 452, 221 N. W. 354. Eaton cannot be deprived of his property for the benefit of the city park or to advance the state's interest in the development of Saratoga. These, of course, are worthy and magnificent causes which do not seek to progress by depriving private citizens of their property without compensation.

If the city of Saratoga Springs desires to beautify the property adjoining its park and its entrances thereto, it cannot do so by the mere zoning process, if this results in rendering private property valueless.

"The division of cities and communities into zoned districts does much to preserve the health, safety, and welfare of the community, but the burdens, so far as possible, must be equally distributed. Anderson v. Jester, 206 Iowa, 452, 221 N. W. 354. Hardships and difficulties there will be and many annoyances; these usually follow any restriction upon the free use of property. When, however, the adjustment becomes so one-sided as to be unreasonable and arbitrary, unnecessary to the preservation of the scheme and purpose as a whole, approaching the point where an owner is deprived of any beneficial or profitable use of his property, then the court should step in and afford relief. See People ex rel. St. Albans-Springfield Corp. v. Connell, 257 N. Y. 73, 177 N. E. 313, and Nectow v. City of Cambridge, 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842."

It is our opinion accordingly that the judgment of the district court should be reversed and that court directed to issue its order restraining the City from enforcing its zoning ordinance as to Lots 13 and 14 for residence purposes only, and directing that said lots should be permitted to be used for business purposes, as appellant has petitioned. An order to that effect will be entered.

*Reversed with instructions.*

KIMBALL and BLUME, JJ., concur.